UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| STEPHANIE ZDROWSKI, Guardian<br>Ad Litem of C.R., a minor,<br><br>     Plaintiff,<br><br>v.<br><br>STACEY RIECK, NICOLE ADAMSON,<br>MICHAEL E. SHARROW, and ALGONAC<br>COMMUNITY SCHOOLS,<br><br>     Defendants. | Case No. 13-cv-12995<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [69]**

Plaintiff Stephanie Zdrowski's son ("C.R.") has been diagnosed with Asperger's Syndrome, Oppositional Defiant Disorder, and other disabilities. This lawsuit arises from C.R.'s experiences in the Algonac Community School District. Zdrowski alleges that the school superintendent, the School District, and two of C.R.'s teachers discriminated against C.R. due to his disabilities and that they committed negligent and intentional torts against him. Now before the Court is Defendants' Motion for Summary Judgment. (Dkt. 69.)

Many of Zdrowski's disability claims were not adjudicated through the administrative process prescribed by the Individuals with Disabilities Education Act and are therefore not properly before this Court. Others are not factually supported by the record. As to those claims which pass those two hurdles, Zdrowski has not established that the Defendants intended to discriminate against C.R. because of his disability. Further, Defendants are entitled to governmental immunity on the tort claims and Zdrowski's state law disability claim is preempted. For these reasons, the motion will be GRANTED.

## I.  FACTUAL BACKGROUND

Because this is Defendants' motion, the Court views the facts in the light most favorable to Plaintiff and draws all reasonable inferences in her favor.

### A.  Background

C.R. spent a few years in the Algonac Community School District ("the School District"). He attended Millside Elementary School as a kindergartener in the 2009/2010 academic year, and left at the end of third grade when his parents moved into the Port Huron Public School district. (Dkt. 77, Zdrowski Dep. at 56.) During the events giving rise to this suit, Defendant Michael Sharrow was the superintendent of the School District. (Compl. at ¶ 10; Def.'s Br. at 3.) Non-party Valerie Baldwin is the principal of Millside Elementary. (Dkt. 72, Baldwin Dep. at 55.)

C.R. displayed certain behavioral issues before and during his time in the School District. After C.R. turned three, his parents started to notice "oppositional behavior" and that he would "anger very easily." (Dkt. 77, Zdrowski Dep. at 92.) C.R. "denie[d]" these behaviors and when confronted, "he simply g[ot] angrier and more defiant." (*Id.*) C.R.'s mother, Stephanie Zdrowski,[1] raised concerns with his pediatrician regarding these behaviors beginning in 2008, when C.R. was 4. (*E.g.* Dkt. 79, Medical Record of Dec. 12, 2008.)

Before C.R. matriculated at Millside, the School District prepared an Individualized Education Program ("IEP") for him (presumably because he would be starting in the District as a kindergartener). (Dkt. 78, IEP No. 1.) The School District recommended that C.R. be provided with a speech pathologist and other special education services. (*Id.*) Zdrowski signed the IEP on November 27, 2001, certifying that she had "been informed of all procedural safeguards and

---

[1] Zdrowski married after she filed this lawsuit and changed her legal name to Stephanie Lee Rice. (Zdrowski Dep. at 9.) The Court refers to her as Zdrowski for consistency.

sources to obtain assistance [and] . . . under[stood] the contents of this IEP [and] . . . agreed with the IEP and its implementation." (*Id.* at 5.) The signature box also advised, "If a parent or public agency disagrees with this IEP, either party has the right to request a due process hearing by following the procedures outlined in the Procedural Safeguards." (*Id.*)

Zdrowski alleges that C.R. was bullied throughout his time in the School District. (Dkt. 101-2, Zdrowski Aff. at ¶ 30.) At her deposition, Zdrowski recalled some instances of misbehavior on the school bus (Zdrowski Dep. at 127) and that C.R. was not included in a "popcorn party" in the classroom (*Id.* at 122). She also submitted a drawing by C.R. in which she says he "drew . . . himself being bullied." (Pl.'s Resp. Br. at 22; Dkt. 101-20, Drawing.) Baldwin testified that she did remember some instances of reported bullying. (Baldwin Dep. at 46.) She first stated that C.R. felt "bothered . . . that the students would tell on him." (*Id.* at 46–47.) But she also said that there was a boy on C.R.'s bus who also had autism spectrum disorder, and that apparently the two had been making faces at each other. (*Id.* at 48.) Baldwin stated that she talked to the boy about how his actions made C.R. feel but that no official action was taken. (*Id.*)

## B. Kindergarten

C.R. entered kindergarten at Millside in the fall of 2009. His teacher reported several incidents involving other students to his parents, including verbal threats and hitting by C.R. (Dkt. 80, Behavior Reports.) The report slips indicate that copies were to be sent to C.R.'s parents, principal, and teacher. (*E.g. id.* at PageID 654.) During this time, C.R. was in therapy. (Zdrowski Dep. at 26.) Defendants say that Zdrowski never informed the school of this, but Zdrowski avers that she kept the school updated as to C.R.'s treatment. (Zdrowski Aff. at ¶¶ 2–4.) Zdrowski reported concerns about C.R.'s anger to his doctors. (*Id.* at 28.) Zdrowski also avers that she requested a one-on-one aide for C.R. from the school at this time. (Zdrowski Aff. at ¶ 4.)

She says that C.R.'s teachers made him sit alone in a corner when he was misbehaving. (Zdrowski Aff. at ¶ 40.)

Eventually, the School District formed a "Teacher Assistance Team" to address C.R.'s behavioral problems. (Zdrowski Dep. at 2.) Zdrowksi avers that she did not give her consent to form the Teacher Assistance Team, but Defendants attached a consent form signed by Zdrowski, which reads "I am aware that my child was referred to the Teacher Assistance Team to discuss appropriate intervention Strategies. The team will discuss my child's school performance and implement appropriate strategies to enhance his/her performance." (Dkt. 81, Consent Form.)

## C.  First Grade

Zdrowski testified that first grade got off to a good start and that there were no problems. (Zdrowski Dep. at 120.) But during the 2010-11 academic year, C.R. developed anger issues related to his grandfather dying, his new sister being born, and his parents moving. (*Id.*) His teachers filed reports of hitting, pinching, spitting, and threatening behaviors. (*See* Behavior Reports.) Medical providers at Catholic Social Services of St. Clair County diagnosed C.R. with Adjustment Disorder and Oppositional Defiant Disorder. (Zdrowski Dep. at 32; Dkt. 82, Medical Records.) The report states that C.R. had expressed a desire to commit suicide. (Medical Records.)

In response to C.R.'s behavior, the school performed a Functional Behavior Assessment ("FBA") (Dkt. 84) and created a Behavior Intervention Plan ("BIP") (Dkt. 83). (*See* Baldwin Dep. at 56.) The FBA summarized C.R.'s issues as follows: "The available information suggests that when C.R. is asked to do work in conjunction with unstructured situations, he is disrespectful . . . ." (Assessment at 2.) The Plan prescribed a set of actions to help C.R. in the classroom, including sensitivity training for C.R.'s class (which Zdrowski did not agree to),

4

using a points chart for good behavior, and daily e-mails sent to Zdrowski. (BIP.) The BIP also stated that "If C.R. gets physical . . . contact parent," and to do so "when applicable." (*Id.* at 2 (ellipses in original).) The BIP also provided for "Crisis Intervention," stating that "Principal/Office will be contacted immediately" by school staff on an "ASAP" basis. (*Id.* at 3.)

Baldwin testified that during the 2010 academic year, the School District was attempting various accommodations for C.R. before referring him to a special education class. (Baldwin Dep. at 14–16.) For example, C.R. was seated close to the teacher, was allowed extra time in the halls to allow him to cope with the unstructured setting, and he was allowed to be first in line to limit the potential for conflicts regarding personal space. (Dkt. 85, IEP No. 2.) The goal, Baldwin testified, was to determine whether C.R. was capable of succeeding in a general education setting. (Baldwin Dep. at 14–16; 57–59.) Zdrowski acknowledges this testimony and admits that the aforementioned accommodations were used, but says that during this time she wanted a one-on-one aide for C.R. and requested an IEP hearing to discuss this request, but that her request was denied. (Zdrowski Dep. at 10.)

### D. Second Grade

Defendant Stacey Rieck was C.R.'s teacher for second grade, and Defendant Nicole Adamson taught in a nearby classroom. (Dkt. 73, Rieck Dep. at 5; Dkt. 74, Adamson Dep. at 5.) Rieck is certified to teach K-12 and has training in teaching students with autism. (*Id.* at 29.) Adamson is a special education teacher with training in crisis response and intervention. (Adamson Dep. at 4–5, 18.)

The summer before second grade, C.R. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Oppositional Defiant Disorder by Dr. Hull of Children's Health Care of Port Huron. (Dkt. 101-24, Children's Health Care Records.) And shortly after

entering second grade, C.R. was examined at St. John Children's Center by Dr. John J. Zmiejko.

(Dkt. 86, St. John Record.) Dr. Zmiejko offered this assessment:

> [C.R.] is a 7-year and 8-month-old boy with a clinical diagnosis of ADHD and oppositional defiant disorder based on the most recent psychological evaluation. According to mother, he has been on ADHD medications on and off for the past 1-1/2 years with no improvement in his symptoms. . . . The major behavioral problems include defiance, noted both at school and at home, and very poor social skills. . . . [C.R.] can be very moody and change his mood in a split second.

(*Id.* at 1.) The doctor also noted that C.R. "may get physical and hit other people at school and also his parents" and "often blames and denies that he did something" when confronted. (*Id.*) Rieck testified that she was not informed of these diagnoses. (Rieck Dep. at 39–40.) Zdrowski avers that she requested a one-on-one aide at this time (Zdrowski Aff. at ¶ 3), but Defendants point out that Zdrowski testified in her deposition that she only requested a one-on-one aide in 2009. (Dkt. 108, Def.'s Reply at ii (citing Zdrowski Dep. at 10).)

In January 2012, the School District referred C.R. to special education. (Dkt. 87, Referral.) The referral stated that "[C.R.] has an outside diagnosis of autism, behavior supports and strategies have been put into place, but he still is having difficulty with peer relations, behavior, and work completion. [C.R.] shuts down or bothers others." (*Id.*) Zdrowski consented to the referral. (Zdrowski Dep. at 40.) In February 2012, C.R. was diagnosed with Asperger's syndrome. (*Id.* at 48.)

After the referral was entered, on March 8, 2012, the School District created a new IEP for C.R. (IEP No. 2.) This involved evaluation by a Multidisciplinary Evaluation Team ("MET"). (Dkt. 89.) As part of this process, Dr. William Irving, the school psychologist, evaluated C.R. (Dkt. 101-5, Irving Evaluation.) Irving observed that "[C.R.] has some cognitive, emotional, and social characteristics associated with the autism spectrum. . . . the frequency and disruptive nature of some of [C.R.'s] negative reactions in the school/classroom setting have necessitated

6

the implementation of both a structured behavior plan and presence of a paraprofessional to guide [C.R.'s] daily behavior." (*Id.* at 1.) He did not comment on any future need for a paraprofessional in the classroom.

Ultimately, the IEP instructed that C.R. "would benefit from social stories that are geared toward teaching social cues and expectations. The use of the five pt. anxiety scale using visuals and/or scales would alleviate [C.R.'s] ability to express thoughts or feelings giving him the tools to express himself emotionally." (IEP No. 2 at 3.) And further, "Direct speech and language services are recommended to increase pragmatic language skills." (*Id.*) While C.R. remained in his regular classroom, he had access to the resource room in the special education classroom and worked with a speech pathologist and the school social worker. (*Id.* at 8; Rieck Dep. at 25.) The School District provided written notice to Zdrowski regarding the new IEP, which Zdrowski signed. (Dkt. 90, Notice for Initial Provision of Services and Programs.) The notice also provided a web address to access the Procedural Safeguards Notice under the Individuals with Disabilities Education Act. (*Id.*)

There was a hearing regarding the IEP on March 8, 2012. (IEP No. 2 at 1; Zdrowski Aff. at ¶ 8.) Zdrowski avers that at this hearing, she "stated that C.R. needed a one-on-one aide to help him deal with his Autism, ADHD, and Oppositional Defiant Disorder." (Zdrowski Aff. at ¶ 8.) Baldwin testified that "[o]ne-on-one is one that we don't often go to right away because it is restrictive for the child. The best practices have found that peer-to-peer support is better for the students because it is having them have less dependency on another adult." (Baldwin Dep. at 21.) Rieck testified that C.R. was not assigned an aide because "for least restrictive environment, an aide wasn't necessary." (Rieck Dep. at 25.)

There is no dispute that there was an aide in C.R.'s classroom for some of the year (starting in October 2011 (Dkt. 101-18, Partial Settlement Agreement)), but she was not dedicated to C.R. (instead, she was assigned to the classroom as a whole) and she left in May 2012. (Zdrowski Aff. at ¶¶ 11–12; Baldwin Dep. at 19–20; Rieck Dep. at 38.) Baldwin testified that the aide was placed in the classroom due to C.R.'s "interactions" with a student named Lily. (Baldwin Dep. at 19.) Lily's mother had complained that C.R. was "targeting" Lily for verbal and physical bullying, and C.R. told Baldwin that Lily was "provoking him." (Baldwin Dep. at 20; Dkt. 98, E-mail of Feb. 28, 2012.)

For example, Lily accused C.R. of touching her inappropriately. (Zdrowski Aff. at ¶ 36.) Zdrowski avers that C.R. was suspended for three days while the School District conducted an investigation. (Id. at ¶ 37; Baldwin Dep. at 43–44.) Defendants, citing their Answer to the Complaint, say that C.R. was not suspended. (Def.'s Reply Br. at xv.) And Baldwin testified that she was not aware of any suspension or any record of a suspension. (Baldwin Dep. at 50.) C.R.'s attendance records are not part of the record. Ultimately, the School District concluded that there was no basis for the allegations and C.R. returned to school. (Zdrowski Aff. at ¶ 38.) The School District did not take any action against Lily.

Lily left the school in early May 2012 (Rieck Dep. at 38), and once she was gone, the school felt that the classroom was "stable" (Baldwin Dep. at 24). So when the aide resigned on May 16, 2012, (Dkt. 99, Resignation Approval) she was not replaced (Baldwin Dep. at 24). Sharrow testified that there was also a timing issue: "It was in May. So if you have three-four weeks of school left, by the time you post it 20 days, interviewed, it was probably why the aide wasn't replaced at that point." (Dkt. 101-19, Sharrow Dep. at 20.)

8

### 1. Kroger Incident

Near the end of the school year, after the aide had resigned, C.R. was admitted to Harbor Oaks Hospital for eight days, from June 2 to June 8, 2012. (Dkt. 93, Harbor Oaks Record.) He was admitted for "increasing anger episodes and suicidal ideations and homicidal ideations." (*Id.* at 6.) The hospitalization occurred after an incident in a Kroger store:

> The patient reportedly became markedly agitated at a Kroger store because his mother would not buy him something he wanted. He began to physically hit her and take things off of the shelves, and refused to be redirected. The mother ended up having to call the police. The patient reportedly also continued to attack the policeman who came to subdue him and bring him into the hospital. The mother reports that these kind of episodes have continued [and] she is increasingly concerned for his aggression.

(*Id.* at 7.) The related Police Report is also part of the docket, but it is not as detailed as the hospital report:

> Stephanie [Zdrowski] was having trouble with her 8 year old son [C.R.]. [C.R.] refused to get in the van and go home. [C.R.] did get in the van and I followed them home. I stood by as Stephanie pack[ed] some things, she transported [C.R.] to Harbor Oaks.

(Dkt. 94, Police Report.)

### 2. Classroom Incident

According to Rieck's testimony, C.R. returned to school on June 12, 2012 (Rieck Dep. at 10.) Rieck testified that C.R. seemed "kind of withdrawn," "angry and quiet," and "just different, kind of edgy." (*Id.* at 40.) She said that around 10:30am, she had started a classroom activity with small groups, and that the children in C.R.'s group reported that he was shooting rubber bands. (*Id.* at 10.) Rieck approached the group. (*Id.*) C.R. then "grabbed a plastic tublet, and he threw it, and he hit a child in the head." (*Id.*) Rieck told C.R. that he was "done with" the activity and C.R. "stood up" and "ran behind the wall" and "latched onto the cubbies." (*Id.*) Rieck asked another student to get Adamson. (*Id.* at 11–12.) Adamson testified that when she arrived, she saw

9

that C.R. was "squeezing himself in a cubby, not hurting himself, not hurting anyone else" but that "[h]e did look very agitated." (Dkt. 74, Adamson Dep. at 5.) Adamson testified that at this point, she attempted to "verbally de-escalate his behavior" but when C.R. did not respond, she "just sat there and just watched him, so that way he was safe, and I made sure that he wasn't hurting himself." (*Id.* at 6.) Adamson then contacted Lisa Koehn, the school social worker, and Rieck contacted other school officials including a secretary and an assistant school superintendent (Plaintiff points out that these individuals did not assist during the incident.) (*Id.* at 7–8.) But neither called C.R.'s parents. (*Id.* at 8.)

The parties dispute what happened next. Zdrowski provided an affidavit from C.R., in which C.R. avers that Rieck and Adamson "dragged [him] out from under the cubby against [his] will." (Dkt. 101-9, C.R. Aff., at ¶ 5.) At his deposition, C.R. was unable to remember how he emerged from the cubby. (C.R. Dep. at 11.) At her deposition, Zdrowski testified,

> I believe there was a couple of days, right after that happened, I met with Valerie [Baldwin], and we talked about it, and I know that day of, [Rieck] wasn't able to come down there to talk, but she did come down and talk with me and talk with me about what had happened, and [Rieck] did admit to me of her and Ms. Adamson pulling [C.R.] out from underneath the cabinet.

(Zdrowski Dep. at 139.) But Rieck testified in her deposition that she did not say anything to Zdrowski regarding the cubby. (Rieck Dep. at 32.)

According to Adamson's deposition testimony, C.R. emerged from the cubby on his own and Adamson then asked C.R. to "go to my room or go down to the office, not as punishment but as a cooling down period." (Adamson Dep. at 5.) Adamson says that C.R. said no, laid down on the floor and "scooted himself underneath the cubby." (*Id.*) Then C.R. got up, walked back to his chair, and "proceeded to pick up the pencil and point it at himself." (*Id.* at 9.) Rieck, who had been on the phone with school officials, also approached C.R. at this point. (Rieck Dep. at 14.)

10

She testified that C.R. "had the pencil in his hand up as if he would stab himself, and he was talking about killing himself at that time." (*Id.*) In his deposition, C.R. acknowledged having the pencil and saying that he might hurt himself with it. (Dkt. 75, C.R. Dep. at 11.) Adamson then held C.R.'s arms up and Rieck opened his hand to retrieve the pencil. (Rieck Dep. at 14; Adamson Dep. at 10–11.)

Both teachers testified that after Rieck removed the pencil, C.R. was still "agitated" and "unpredictable" and was "screaming that he wanted to hurt himself, that he hated himself, that he hated his life." (Adamson Dep. at 11; Rieck Dep. at 14.) Adamson testified that C.R. threw paper at other students, and Rieck testified that C.R. kicked at Adamson when she tried to restrain him. (Adamson Dep. at 11; Rieck Dep. at 15.) Adamson and Rieck agreed that C.R. would not be able to stay in the classroom. Adamson asked Rieck to assist her in transporting C.R. to the office in the "transport position." (Rieck Dep. at 15.) In this position, two people stand on either side of the individual to be transported, holding the individual's wrist in their outside hands and hooking their inside arms under the transportee's arms. (Dkt. 101-12.) Rieck had not had training in the transport position, but Adamson testified that she "talked [Rieck] through the whole process." (Adamson Dep. at 19.)

Both teachers testified that C.R. was initially compliant when they escorted him to the office, but eventually started to resist by kicking, yelling, and attempting to bite. (Adamson Dep. at 13; Rieck Dep. at 16.) Both teachers testified that they put C.R. down when he was struggling and only continued moving down the hallway after he got up. (*Id.*) But C.R. avers that the two "dragged" him to the office while he was still struggling. (C.R. Aff. at ¶ 6.) C.R. ended up in the nurse's office for "probably another half hour" after this. (Adamson Dep. at 14–15.)

11

According to Adamson, Zdrowski was not contacted about this incident until after it was over and C.R. was in the nurse's office. (Adamson Dep. at 14.) Zdrowski says that C.R. suffered bruises from the incident, and attached an undated photo to her response brief showing an unidentified child with a small bruise on his right forearm and red marks on both forearms. (Dkt. 101-10, Photo.) Baldwin and Adamson both testified that they did not see any bruises on C.R. after the incident. (Baldwin Dep. at 10; Adamson Dep. at 16–17.)

### 3. Mental Health Treatment, June 2012 through December 2012

After this classroom incident, C.R. was admitted at Harbor Oaks Hospital. (Zdrowski Aff. ¶ 41.) A discharge report stated that C.R. had been diagnosed with Intermittent Explosive Disorder, "PTD," and Oppositional Defiant Disorder. (Dkt. 101-22, Medical Records.) C.R. then went to Blue Water Housing, a group home, from July 10, 2012, to October 2012. (Zdrowski Aff. at ¶ 44.) After this, C.R. went to the Hawthorn Center. (Zdrowski Aff. at ¶ 45.) The discharge summary indicates that he was admitted "because of impulsive, aggressive behavior" such as "breaking things in the house, beating up his mother and sister, threaten[ing] to kill his parents" and "verbaliz[ing] a plan to kill himself prior to admission." (Dkt. 108-2, Hawthorn Center Discharge Summary at 1.) The summary does not mention the alleged dragging incident. (*See id.*) It also states that C.R. was diagnosed with Depressive Disorder and Anxiety Disorder. (*Id.* at 2.)

After Hawthorn, C.R. was admitted to Havenwyck Mental Hospital. (Zdrowski Aff. at ¶ 46.) The Havenwyck records state, "Mother indicates the patient has been brought to the hospital because he has been having 'meltdowns' which have increased." (Dkt. 108-3, Havenwyck Records at 2.) C.R. was "making homicidal threats towards family," was "found to be hiding a garden tool in his pocket with plan to use that to kill his father," and "attempted to steal his

mother's credit card[.]" (*Id.*) The record notes that this was his "10th hospitalization[.]" (*Id.*) The care providers at Havenwyck diagnosed him with intermittent explosive disorder and pervasive developmental disorder. (*Id.* at 3.) These records also make no reference to the alleged dragging incident at school. (*See id.*)

### E.  Third Grade

C.R. returned to Millside for third grade and Adamson was his teacher that year. An amended IEP was put into place on March 7, 2013. (Dkt. 96, IEP Amendments.) Under the amended IEP, C.R. received a one-on-one aide during "general education/academic classes[.]" (*Id.* at 5.) C.R.'s parents have since moved (it is unclear from the record exactly when) and C.R. is now zoned for the Port Huron Public Schools. (Zdrowski Dep. at 56.) He does not have a one-on-one aide at his new school because "[t]hey did the evaluation and said that they don't believe that [C.R.] needs those services." (*Id.*)

### F.  Michigan Department of Education Complaint

On April 25, 2013, Zdrowski signed a Due Process Complaint with the Michigan Department of Education's Office of Special Education (it was received on April 29, 2013). (Dkt. 97.) The Model Form asked Zdrowski to describe the "nature of the problem that relates to the student's special education program and . . . the facts that relate to the problem[.]" (*Id.* at 2.) Zdrowski responded: "1. My son's aide was taken away in May, 2012[; and] 2. Physical force was used on my son in June, 2012." (*Id.*) The Model Form also asked Zdrowski to "[b]riefly explain how you think the issue should be resolved." (*Id.*) She responded: "1. Do not take away my son's aide again[;] 2. No physical force to be used on my son[;] 3. Money damages." (*Id.*)

Zdrowski reached a settlement with the School District and the parties filed a Stipulation of Resolution. (Dkt. 101-23.) An order of Partial Settlement (Dkt. 101-18) reflected the parties'

13

agreement that "corrective measures have taken place as it relates to the two sets of facts leading to this complaint . . . ." The Stipulation of Resolution noted that "[o]n or about June 3, 2013 the Court ruled that the petitioner was not entitled to recover general money damages as a result of this proceeding[.]" (Stipulation of Resolution at 1.)

### G.  Federal Lawsuit

Zdrowski filed this lawsuit on behalf of C.R. on July 12, 2013. (Dkt. 1, Compl.) She filed an amended complaint the same day. (Dkt. 7, Am. Compl.) She named Rieck, Adamson, Sharrow, and the School District as Defendants. The Amended Complaint alleges seven counts: Count I, Violations of the Americans with Disabilities Act and the Rehabilitation Act; Count II, Section 1983; Count III, Violation of the Michigan Persons with Disabilities Act; Count IV, Assault and Battery; Count V, Negligence against Rieck, Adamson, and Sharrow; Count VI, Negligence against the School District; and Count VII, False Imprisonment.

Defendants filed a motion for summary judgment on September 19, 2014. (Dkt. 69.) Plaintiff responded on October 30, 2014. (Dkt. 101.) On December 11, 2014, the Court granted Defendants' Emergency Motion to Strike two exhibits (an expert report and a medical record) attached to Plaintiff's response brief. (Dkt. 107.) Defendants then filed their reply brief. (Dkt. 108.) The Court heard oral argument on July 1, 2015, and the motion is now ready for disposition.

## II.  LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for

summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

Because Defendants do not bear the burden of persuasion at trial, they may discharge their initial summary-judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support [Plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If Defendants do so, Plaintiff "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of Plaintiff's claims to a jury, or whether the evidence is so one-sided that Defendants must prevail as a matter of law. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

The Court first addresses Plaintiff's disability-related claims and substantive due process claim and then turns to Plaintiff's tort claims. Plaintiff faces many hurdles in asserting the disability claims: Defendants argue exhaustion, statute of limitations, intent, preemption, and limitations on individual liability. Several of these arguments interlock to require dismissal of Counts I and III. As to the substantive due process claim, the Court finds that Defendants' conduct does not "shock the conscience." The Court next finds that Defendants are entitled to governmental immunity for the tort claims.

### A. Disability Rights Claims (Counts I, II, and III): Procedural Issues

The bulk of the briefing was dedicated to Plaintiff's disability rights claims. In Counts I and III, Plaintiff asserts that Defendants discriminated against C.R. due to his autism spectrum

disorder in violation of state and federal disability rights legislation. In Count II, Plaintiff asserts that Defendants violated C.R.'s "substantive due process rights." All of these claims are based on the same alleged acts and omissions, namely: C.R. was not provided with a one-on-one aide, the alleged dragging incident, Defendants' alleged refusal to create an IEP and test for autism, the suspension after Lily's allegations of improper touching, the delay in referring C.R. to special education, that C.R. was forced to sit in a corner in kindergarten, the fact that the March 2012 IEP did not provide for a paraprofessional, an alleged attempt to force C.R. to transfer schools, and alleged bullying of C.R. by other students.[2] (Compl. at ¶¶ 14–23; Pl.'s Resp. at 44–45.)

Plaintiff's federal claims are brought under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504(a) of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.

---

[2] In the Amended Complaint, Plaintiff also alleged that "[t]he Defendants indicated to C.R. that if he did not have his mother attend a school picnic, then he could not attend." (Am. Compl. ¶ 52(h).) Neither party's brief mentions this incident. Nor is there any mention of it in those portions of the record that the parties pointed out in their briefs. Given that there is no evidence that this incident ever occurred, the Court will not consider it as part of Plaintiff's disability discrimination claims. *See Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 477 (6th Cir. 2010) (affirming the district court's grant of summary judgment in a slip-and-fall case where "There [was] simply no evidence that [Defendant] had any knowledge of the alleged hazard and no evidence upon which to impute knowledge to [Defendant].").

Plaintiff also asserts a state law claim under the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), which provides that "[t]he opportunity to obtain . . . full and equal utilization of public accommodations, public services, and educational facilities without discrimination because of a disability is guaranteed by this act and is a civil right." Mich. Comp. Laws § 37.1102(1). Except as otherwise provided in the statute, "a person shall accommodate a person with a disability for purposes of employment, public accommodation, public service, education, or housing unless the person demonstrates that the accommodation would impose an undue hardship." Mich. Comp. Laws § 37.1102(2).

### 1. IDEA Exhaustion

The Court must first address the impact of the Individuals with Disabilities Education Act ("IDEA") on this case. Some background on the IDEA's procedural protections is necessary for this purpose.

In passing the IDEA, Congress "intended to open the door of public education to all qualified children and required participating States to educate handicapped children with nonhandicapped children whenever possible." *Cedar Rapids Cmty. Sch. Dist. v. Garret F. ex rel. Charlene F.*, 526 U.S. 66, 78 (1999) (citations and internal markings omitted). The statute "leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, [but] imposes significant requirements to be followed in the discharge of that responsibility." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005) (citation omitted). "[T]he core of the statute . . . is the cooperative process that it establishes between parents and schools." *Id.* The "central vehicle" for this procedure is the Individual Education Plan ("IEP") process set out in section 1414 of the statute, which establishes a

17

framework for parents and educators to work together to identify, evaluate, and plan the education of disabled children. *See id.* at 53–54.

In order to receive federal assistance under the IDEA, states must comply with certain conditions. 20 U.S.C. § 1412. Among these is a requirement that states create administrative procedures to review decisions regarding the "identification, evaluation, . . . educational placement, or the provision of free appropriate education." 20 U.S.C. § 1415(b)(1)(E). Michigan has implemented these requirements through the Michigan Mandatory Special Education Act ("MMSEA"), Michigan Compiled Laws § 380.1701. Michigan regulations provide that state agencies are also bound by federal IDEA regulations. *See* Mich. Admin. Code R. § 340.1851.

When a parent disagrees with an IEP, there are two procedural avenues available. The first is an informal complaint process (also known as a state complaint). *See* 20 U.S.C. § 1415(b)(6); Mich. Admin. Code § 340.1851. The second is a formal administrative hearing process (also known as a due process complaint). *See* 20 U.S.C. § 1415(b)(7). The latter procedure is the one that Zdrowski pursued. The Sixth Circuit recently described the extensive steps that this procedure involves in Michigan:

> Within 15 days of receiving notice of a child's parents' complaint, the local educational agency must hold a "preliminary meeting" with the parents and other members of the IEP team to give the local educational agency "the opportunity to resolve the complaint." If the local educational agency has not resolved the dispute within 30 days of receiving the complaint, the timeline for a "due process hearing" begins. This process must conclude—with the local or state educational agency issuing a written decision to the parties—within 45 days. If the local agency conducted the hearing, the decision can be appealed to the state educational agency, which conducts an impartial review and issues a decision within 30 days. These deadlines are of course not entirely set in stone, but in the abstract a dispute about an IEP should go through a resolution meeting, a local agency determination, and a state agency determination within 105 days of the initial complaint. Only at this point may either party take the dispute to court, and the court then receives "the records of the administrative proceedings."

*Fry v. Napoleon Cmty. Sch.*, --- F.3d ---, No. 14-1137, 2015 WL 3634460, at *3 (6th Cir. June 12, 2015) (citing 20 U.S.C. § 1415; 34 C.F.R. § 300.515).

These procedural requirements are meant to give "[f]ederal courts–generalists with no expertise in the educational needs of handicapped students– . . . the benefit of expert factfinding by a state agency devoted to this very purpose." *Id.* Accordingly, the IDEA requires that would-be plaintiffs exhaust these administrative remedies before bringing suit. 20 U.S.C.A. § 1415(l). And this requirement applies even where plaintiffs have chosen not to sue under the IDEA:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, *except that* before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) *shall be exhausted* to the same extent as would be required had the action been brought under this subchapter.

*Id.* (emphasis added). "[B]y virtue of 20 U.S.C. § 1415(l), a plaintiff must exhaust the same remedies under the IDEA as a prerequisite to bringing an action under any federal civil rights statute . . . as long as plaintiff is seeking relief available under the IDEA." *B.H. v. Portage Pub. Sch. Bd. of Educ.*, No. 1:08-CV-293, 2009 WL 277051, at *7 (W.D. Mich. Feb. 2, 2009).

If the plaintiff's claims are subject to IDEA exhaustion and have not been exhausted, courts generally dismiss the case unless the plaintiff can demonstrate that an exception to the exhaustion requirement has been met. *See Griffin v. Sanders*, No. 11-CV-12289, 2013 WL 3788826, at *10 (E.D. Mich. July 19, 2013) ("[C]ourts have generally analyzed claims in two steps: first, a court determines whether a plaintiff has an exhaustion obligation; second, a court examines whether the plaintiff has demonstrated futility that would excuse exhaustion.").

Given these standards governing exhaustion, there are several questions before the Court: Does a settlement agreement suffice to exhaust Plaintiff's claims based on the one-on-one aide

19

and the dragging incident where the agreement was reached before any ALJ made any findings? If not, can Defendants waive exhaustion of the claims based on these two incidents such that the Court can reach the merits of those claims without ALJ findings? Are the other claims (which are clearly unexhausted) subject to IDEA exhaustion? And for those claims which are subject to IDEA exhaustion and have not been exhausted, has Plaintiff demonstrated that exhaustion would be futile? The Court addresses each of these exhaustion questions in turn.

*The Settlement Agreement*

It is undisputed that Plaintiff pursued two of the claims she asserts in this suit through a due process complaint with the Michigan Department of Education; namely, her claims that "physical force was used on my son" and that "my son's aide was taken away." (Settlement Agreement at 2.) Indeed, the administrative complaint and related documents are part of the record. The Settlement Agreement states that "[d]ue to the fact that the parties agree that corrective measures have taken place as it relates to the two sets of facts leading to this complaint, this document should serve as a settlement between the parties as to two of the three requested resolutions. . . . " (Settlement Agreement at 2.) And the Stipulation of Resolution, which dismissed the due process complaint, stated that the "remaining issue" of "the [Department's] authority to award general money damages to petitioner in this matter," was resolved when the Department ruled that Plaintiff could not "recover general money damages as a result of this proceeding[.]" (Stipulation of Resolution at 1.) Additionally, the Stipulation stated, "The [Department's] ruling together with the partial settlement that had been filed in this matter has resulted in no further need for the hearing that has been scheduled by the Court for June 18 and 19, 2013." (*Id.*) Neither the Stipulation nor the Settlement Agreement mention the settlement's effect on Zdrowski's ability to bring suit in federal court. As a result of the

settlement, which occurred before the complaint proceeded to a hearing, there are no ALJ findings before this Court.

While the parties did not brief the issue, the Court questions (and raised at oral argument) whether a settlement agreement entered before any factual findings by the ALJ constitutes exhaustion under the IDEA. Case law on this question is sparse, but suggests that a settlement entered before a hearing and without any factual findings by the ALJ is not sufficient to exhaust IDEA remedies. *See Hamilton v. Bd. of Sch. Comm'rs*, 993 F.Supp. 884 (D.Ala.1996), *aff'd without opinion*, 112 F.3d 1172 (11th Cir.1997) (explaining that "there is nothing inherent in a settlement agreement that might fulfill the purposes otherwise satisfied by administrative review."); *see also J.H. ex rel. J.H. v. Egg Harbor Twp. Bd. of Educ.*, No. CIV08-488(JBS), 2009 WL 1322514, at *1 (D.N.J. May 11, 2009) (holding that two orders of settlement did not suffice for exhaustion where "[t]he ALJ orders incorporating the agreements contain no factual record, no resolution of evidentiary disputes, nothing but the agreement arrived at by the two parties"); *Banks ex rel. Banks v. Modesto City Sch. Dist.*, No. CVF046284RECSMS, 2005 WL 2233213, at *8–9 (E.D. Cal. Sept. 9, 2005) ("As in *Hamilton* and unlike the case in *Woods*, the settlement agreement in this case was not entered into after hearings had begun and it was not approved of by an ALJ or other official. Because no hearing was conducted as to Plaintiff's IDEA related issues, she is not an aggrieved party under the statute and her administrative remedies have not been exhausted."). *But see Bess v. Kanawha Cnty. Bd. of Educ.*, No. CIV.A.2:08CV01020, 2009 WL 3062974, at *4 (S.D.W. Va. Sept. 17, 2009) (holding that a settlement agreement sufficed for exhaustion where "First, the plaintiffs are not attempting an end run around the IDEA's procedural requirements. Rather, they have resolved their IDEA claims with the Board. Second, there is no concern for duplicitous adjudication. The settlement

21

agreement resolved all issues regarding Doe's FAPE, and I need not address claims relating to the adequacy of his education. Finally, because I will not be addressing the adequacy of Doe's education, but will instead be addressing constitutional and statutory claims, additional administrative processes are unnecessary.").

While the Court does not believe this particular settlement suffices for IDEA exhaustion purposes – because there was no due process hearing, there are no findings of fact, and the order itself does not preserve Plaintiff's right to bring suit in the district court – at the oral argument, counsel for Defendants stated that he would be prepared for the Court to consider the substance of the narrow claims contained in the settlement agreement as though they had been exhausted. The Court will give effect to Defendants' waiver because it finds the exhaustion requirement is not jurisdictional. The Court is aware of *Metropolitan Board of Public Education v. Guest*, 193 F.3d 457, 463 (6th Cir. 1999), in which the Sixth Circuit seemed to find that IDEA's exhaustion requirements implicate subject matter jurisdiction and are therefore non-waivable. But since *Jones v. Block*, 549 U.S. 199, 218 (2007), in which the Supreme Court held that failure to exhaust administrative remedies was an affirmative defense in the context of the Prison Litigation Reform Act ("PLRA"), district courts in this circuit have held that *Jones* obliges the same conclusion in the IDEA context. *See Gibson v. Forest Hills Local Sch. Dist., Bd. of Educ.*, No. 1:11-CV-329, 2012 WL 1197896, at *3 (S.D. Ohio Apr. 10, 2012) (collecting cases).

The Sixth Circuit has not reexamined *Guest*'s exhaustion holding since 2007, and it appears that the other circuits are split as to whether the exhaustion requirement is jurisdictional. *Compare Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002) ("A plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction."); *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266,

272 (3d Cir. 2014) ("In the normal case, exhausting the IDEA's administrative process is required in order for the statute to "grant[] subject matter jurisdiction to the district court" (citation omitted)); *and MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 536 (4th Cir. 2002) ("The failure of the [plaintiffs] to exhaust their administrative remedies for [certain IDEA-related claims] deprives us of subject matter jurisdiction over those claims"), *with Mosely v. Bd. of Educ. of City of Chi.*, 434 F.3d 527, 533 (7th Cir. 2006) ("A failure to exhaust is normally considered to be an affirmative defense . . . and we see no reason to treat it differently here [under the IDEA]." (internal citations omitted)); *and Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 867 (9th Cir.2011) ("[T]he IDEA's exhaustion requirement is a claims processing provision that IDEA defendants may offer as an affirmative defense."), *overruled on other grounds*, *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir.), *cert. denied sub nom. Scott v. Albino*, 135 S. Ct. 403, 190 L. Ed. 2d 307 (2014); *N.B. by D.G. v. Alachua Cnty. Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996) ("The exhaustion requirement . . . is not jurisdictional and therefore "'is not to be applied inflexibly.'" (citation omitted)).

In 2013, the Tenth Circuit declined to decide the question but noted that "[t]he trend is toward greater precision in jurisdictional analysis" and that "[m]ost of" the cases ruling that IDEA exhaustion is jurisdictional are "the sort of drive-by rulings that the Supreme Court has cautioned against." *Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 784 (10th Cir. 2013).

In light of *Jones* and this case law, and given Defendants' stated willingness to move to the merits of the narrow issues encompassed by the Settlement Agreement, the Court will treat the dragging incident and removal of the aide as though they were exhausted.

*The Unexhausted Claims*

The Court agrees with Defendants that the unexhausted claims regarding the alleged refusal to test C.R., the suspension, the attempt to force C.R. to transfer, the purported deficiencies in C.R.'s kindergarten, first grade, and final IEP are all subject to IDEA's exhaustion requirements.

Generally, "plaintiffs must exhaust IDEA procedures if they seek 'relief that is also available' under IDEA, even if they do not include IDEA claims in their complaint." *Fry*, 2015 WL 3634460, at *2–4. That is to say, "when a plaintiff has alleged injuries that could be reddressed to any degree by the IDEA's administrative procedures and remedies, exhaustion of those remedies is required." *S.E. v. Grant Cnty. Bd. of Educ.*, 544 F.3d 633, 642 (6th Cir. 2008) (quoting *Robb v. Bethel School District # 403*, 308 F.3d 1047 (9th Cir. 2002)). Courts ask whether the claims relate to the provision of a free appropriate education ("FAPE") as defined by the IDEA:

> The term "free appropriate public education" means special education and related services that– (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title."

20 U.S.C. § 1401(9).

Thus, in *Fry*, the Court ruled that plaintiffs were required to exhaust claims regarding a school's refusal to allow a service dog to accompany the student to school: "The primary harms of not permitting [the service dog] to attend school with E.F.—inhibiting the development of E.F.'s bond with the dog and, perhaps, hurting her confidence and social experience at school— fall under the scope of factors considered under IDEA procedures. Developing a bond with [her dog] that allows E.F. to function more independently outside the classroom is an educational

24

goal, just as learning to read braille or learning to operate an automated wheelchair would be." 2015 WL 3634460 at *6.

By contrast, in *F.H. ex rel. Hall v. Memphis City Sch.*, 764 F.3d 638, 644 (6th Cir. 2014), the Court did not require exhaustion where "Appellants allege[d] that F.H. was verbally, physically, and even sexually abused by his aides. These injuries are non-educational in nature and cannot be remedied through the administrative process. Moreover, requiring exhaustion of Appellants' 42 U.S.C. § 1983 claims would create an additional administrative barrier not present for non-disabled children." *Id.*

Here, the alleged refusal to test C.R. for autism and failure to refer C.R. to special education fall within the School District's "child find" obligations to identify, locate, and evaluate all children with disabilities pursuant to 34 C.F.R. §§ 104.32, 104.35. Indeed, disputes regarding these child-find obligations are "precisely the types of fact-intensive inquiries that the administrative process was designed to address" and are "completely educational." *B.H.*, 2009 WL 277051 at *9. The Court finds that these claims are subject to IDEA exhaustion.

As to the alleged suspension, Defendants say that because Plaintiff argues that he was suspended due to behavior stemming from his disability, IDEA exhaustion applies. IDEA's procedural protections include "a right to a manifestation hearing to determine whether the student's conduct was caused by or directly related to his disability; a right to an expedited appeal of the manifestation decision before an impartial hearing officer; and a right to appeal that decision before a state review officer" for "disabled students . . . who are removed from school for disciplinary reasons[.]" *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 209 (2d Cir. 2007) (citing 20 U.S.C. § 1415(k)). Defendants also cite *Sabin v. Greenville Public Schools*, No. 1:99-cv-287, 1999 U.S. Dist. LEXIS 19469, at *26 (W.D. Mich. Dec. 15, 1999),

25

where the court required the plaintiff to exhaust claims relating to his punishments in a "time-out room" where the Plaintiff's Behavior Intervention Plan provided guidelines for such punishments. Similarly, C.R.'s Behavior Intervention Plan addresses consequences for "Severe Behavior." The Court finds that this claim is subject to IDEA exhaustion. By this same logic, the alleged attempt to force C.R. to transfer to a different school as a result of his interactions with Lily would also be subject to exhaustion.

Finally, the purported IEP deficiencies in kindergarten, first grade, and C.R.'s final IEP in March 2012 clearly fall within IDEA's procedural protections. Indeed, if Plaintiff disputed any part of C.R.'s IEP, she had two procedural avenues under the IDEA, as described above. *See* 20 U.S.C. § 1415(b)(6); Mich. Admin. Code § 340.1851; 20 U.S.C. § 1415(b)(7). And the claim that C.R.'s kindergarten teachers punished him by seating him in the corner mirrors the claim in *Sabin*, 1999 U.S. Dist. LEXIS 19469 at *26. These claims were therefore subject to IDEA exhaustion.

Given that all of these claims are subject to IDEA's exhaustion requirements, and that Plaintiff has not argued that they are exhausted (*see* Pl.'s Resp. Br. at 26), the Court must dismiss these claims unless Plaintiff can show that an attempt to exhaust them would be futile.

*Futility*

"Exhaustion is not required if it would be futile or inadequate to protect the plaintiff's rights. Nor is exhaustion required if the plaintiffs were not given full notice of their procedural rights under the IDEA." *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir. 2000) (citations omitted). Plaintiff has "the burden of demonstrating futility or inadequacy" as she "seek[s] to bypass the administrative procedures." *Id.* And "parents may not avoid the state administrative process through 'the unilateral act of removing their child from a public school.'"

*Id.* at 918 (citing *Doe v. Smith*, 879 F.2d 1340 (6th Cir. 1989)). Further, a mere claim for money damages, without more, "is not sufficient to render exhaustion of administrative remedies unnecessary[.]" *Covington*, 205 F.3d at 917.

In *Covington*, the plaintiff asserted claims on behalf of her son, alleging that his school had repeatedly locked him in a "time-out room" with a concrete floor, no furniture, no bathroom, no ventilation, and only a small window. 205 F.3d at 913. The Sixth Circuit held that although plaintiff had failed to exhaust her administrative remedies, exhaustion would have been futile under the "unique circumstances" of the case:

> Although we agree with those courts that have decided that a mere claim for money damages is not sufficient to render exhaustion of administrative remedies unnecessary, we hold that in the unique circumstances of this case—in which the injured child has already graduated from the special education school, his injuries are wholly in the past, and therefore money damages are the only remedy that can make him whole—proceeding through the state's administrative process would be futile and is not required before the plaintiff can file suit in federal court.

*Id.* at 916. And the Court distinguished the facts before it from those of *Doe v. Smith*, 879 F.2d 1340 (6th Cir. 1989):

> In *Doe v. Smith*, we held that parents may not avoid the state administrative process through "the unilateral act of removing their child from a public school." There was no showing in that case that following the school system's administrative procedure would have been futile; indeed, the relief sought by the plaintiff in *Doe v. Smith*—a more appropriate educational placement, provided at public expense—is precisely the kind of relief that the state administrative process is equipped to afford. Therefore, *Doe v. Smith* is inapplicable to a case such as Covington's, where the administrative process would be incapable of imparting appropriate relief due to the nature of Jason's alleged injuries and the fact that he has already graduated from the special education school, not due to Covington's unilateral act.

*Id.* at 918.

Plaintiff seeks to analogize this case to *Covington*, arguing that by the time she filed her due process complaint, the events giving rise to her claims had already taken place. (Pl.'s Resp. Br. at 45.) The analogy is not apt. A decision by another court in this District shows why.

In *Amidon v. Michigan*, No. 04-75003, 2008 WL 723536, at *1 (E.D. Mich. Mar. 17, 2008), plaintiffs asserted that their son's school district had failed to meet his learning disability-related educational needs over a ten-year period. When defendants moved for dismissal based on failure to exhaust, plaintiffs responded that "their son Richard [had] dropped out of school and his 'damages [were] wholly and entirely in the past.' . . . [and] that the only meaningful relief would be an award of monetary damages as compensation for the harm suffered by Richard, both in the past and extending into the future, as a result of Defendants' alleged failure to identify his disabilities and provide appropriate educational services." *Id.* at *7.

The court rejected this argument by distinguishing *Covington*. *Id.* at *7–8. It noted that plaintiffs had commenced the action while their son was still enrolled in school such that they could have pursued administrative remedies at that point. *Id.* Further, plaintiffs' son "removed himself from school through the unilateral act of dropping out." *Id. Covington* was also different, thought the *Amidon* court, because the Amidon's son's injuries were "entirely attributable to purported deficiencies in his educational program—and, hence, could be addressed through an adjusted program of educational services[.]" *Id.* This was "in contrast to the tort-based physical and emotional injuries inflicted upon the student in *Covington*." *Id.*

The Court finds *Admidon* instructive and likewise finds that material facts of this case make it different from *Covington*. Here, Plaintiff filed her original Complaint on July 12, 2013. It is unclear from the record whether C.R. was still enrolled at Millside at this point or whether his parents had moved. But what is clear is that C.R. did not leave the school by graduating; instead,

his parents moved school districts and therefore "unilaterally" removed him from both Millside and the School District. Second, as explained above, the injuries stemming from the events giving rise to the unexhausted claims are attributable to purported deficiencies in C.R.'s educational program.

Thus, Plaintiff has not met her burden to show futility. The claims regarding the suspension, the failure to test, kindergarten punishments, the attempted forced transfer, and First Grade and March 2012 IEPs will be dismissed as unexhausted. The Court therefore will not address Defendants' alternative statute of limitations defense.

### B. Disability Rights Claims (Counts I, II, and III): Substantive Arguments

Remaining for a merits determination are Plaintiff's claims based on the dragging incident, the removal of the aide, and the bullying.

#### 1. Count I – ADA and Rehabilitation Act

In Count I, Plaintiff argues that Defendants' acts and omissions violated the Americans with Disabilities Act and the Rehabilitation Act, § 504.[3]

The Court evaluates the merits of Plaintiff's ADA and § 504 claims together. *S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008). To make out a claim under either statute, Plaintiff must show:

---

[3] Defendants argue that the claims against Rieck, Adamson, and Sharrow (as opposed to the School District) in Count I should be dismissed because neither the ADA nor the Rehabilitation Act allow for individual liability. (Def.'s Br. at 27.) The Court agrees. *See Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009) ("Under the case law of this circuit and our sister circuits, the proper defendant under a Title II claim is the public entity or an official acting in his official capacity. . . . Title II of the ADA does not, however, provide for suit against a public official acting in his individual capacity." (citations omitted)); *Powell v. Morris*, 184 F.R.D. 591, 596 (S.D. Ohio 1998) ("There is no individual liability under the ADA."). Still, Plaintiff can proceed against them in their official capacities because such claims are "for all intents and purposes, against the state of Michigan as the real party-in-interest." *Mingus v. Butler*, 591 F.3d 474, 482 (6th Cir. 2010).

29

> (1) The plaintiff is a 'handicapped person' under the Act; (2) The plaintiff is 'otherwise qualified' for participation in the program; (3) The plaintiff is being excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance.

*Campbell v. Bd. of Educ. of the Centerline Sch. Dist.*, 58 F. App'x 162, 165 (6th Cir. 2003) (quoting *Doherty v. Southern College of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988)). Where, as here, a claim is "buttressed by allegations that a public school district failed to appropriately accommodate a handicapped student's extraordinary educational needs," the claimant

> must prove that the defendant school system failed to supply him or her with a community-financed education which was sufficiently 'appropriate' to his or her personal learning requisites to enable his or her reasonable access to an education similar, relative to his or her individual academic potential and cognitive abilities, to that available, to the average fellow student.

*Id.* And furthermore, even if Plaintiff meets this burden, she must "ultimately prove that the defendant's failure to provide [C.R.] with a 'free appropriate public education' was discriminatory. Surmounting that evidentiary hurdle requires that 'either bad faith or gross misjudgment must be shown before a § 504 violation can be made out, at least in the context of education of handicapped children.'" *Id.* (quoting *Monahan v. State of Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982), *cert. denied*, 460 U.S. 1012 (1983)); *see also G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013).

### *Dragging Incident*

Construing the facts in the light most favorable to Plaintiff and assuming that the teachers continued to use the transport hold while C.R. was struggling (instead of stopping to let him collect himself), the Court finds that the dragging incident does not rise to the level of bad faith or gross misjudgment, especially considered in comparison to the cases the parties cite.

In *Roe ex rel. Preschooler II v. Nevada*, the plaintiff alleged "that Preschooler II was made to walk from the bus to the classroom without shoes on four occasions; (2) that Preschooler II was slapped by Defendant LiSanti, or taken by the hands and forced to slap himself; and (3) that Preschooler II was 'slammed' in a chair by Defendant LiSanti." On the defendants' motion to dismiss, the court held that the plaintiffs' ADA and § 504 claims would survive: "Plaintiffs repeatedly allege, in various ways, that Preschooler II was abused at school by his teacher and that this abuse deprived him of his education . . . . that this abuse happened because Preschooler II was an autistic child and participating in a special education preschool . . . . [and that] Defendants knew of the alleged abuse yet failed to inform Preschooler II's parents[.]" 332 F. Supp. 2d 1331, 1338 (D. Nev. 2004), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175 (9th Cir. 2007). While the disability rights claims were not at issue on appeal, in reversing dismissal of the substantive due process claims, the Ninth Circuit commented that the "alleged slapping, forced participation in self-beating and slamming were unreasonable in light of the child's age and disability and the context of the events. Preschooler II posed no danger to anyone nor was he disruptive in the classroom. At such a young age and suffering from significant and serious disabilities . . . [he] was even more vulnerable than the average pre-school child." *Preschooler II*, 479 F.3d at 1180.

In *E.H. v. Brentwood Union School District*, parents of a disabled student alleged that the student was "inappropriately restrained and subjected to harmful neglect while at school." No. C13-3243 TEH, 2013 WL 5978008, at *1 (N.D. Cal. Nov. 4, 2013). The plaintiffs alleged violations of § 504 and the ADA based on the defendants' use of "basket holds," "dragging," and pulling when restraining the student. *Id.* On the defendants' motion to dismiss, the court

31

dismissed the ADA claim on Eleventh Amendment grounds, but permitted the § 504 claim to proceed: "the complaint alleges discrimination in the form of school staff scratching Plaintiff, grabbing him, and dragging him in direct response to the manifestations of his disability." *Id.* at *3. And in discussing the plaintiff's Fourth Amendment claims, the court commented that "[w]hile discovery may reveal that the school officials' actions were justified, based on the pleadings alone, it is *plausible* that the officials' actions were excessive." *Id.* at *3 (emphasis in original).

Finally, in *Alexander v. Lawrence County Board of Developmental Disabilities*, the plaintiff sued her autistic son's teachers and school, alleging that the "[d]efendants frequently physically restrained M.L. using a variety of techniques that included basket holds and prone restraints, which consisted of having as many as five employees 'hold M.L. face down on the ground while' sitting on him." 2012 U.S. Dist. LEXIS 32197, *5 (S.D. Ohio Mar. 12, 2012). On the defendants' motion to dismiss plaintiff's ADA and § 504 claims, the court held that "the alleged factual context can give rise to the inference that Defendant, as a special education provider, consciously disregarded M.L.'s situation by employing physical restraint techniques, despite knowledge of their ineffectiveness and harm. Given that nothing in the pleadings suggests that Defendant had a legitimate nondiscriminatory reason for its conduct, one could plausibly infer that Defendant's improper actions were intentionally directed toward M.L. solely because of his disability." *Id.* at 36.

In this case, Defendants dragged C.R. down the hall a single time using the transport position. Defendants acknowledge that the transport hold should not be used on a struggling student, but they say that they used it because C.R. was threatening to harm himself. Adamson testified that she considered using the "team control position," which is recommended in lieu of

the transport position when the individual is struggling. (Adamson Dep. at 23–24.) But she ultimately decided against it because she "thought it would be a lot more stress for him putting his head between his legs." (*Id.* at 24.) Plaintiff does not rebut this explanation. The Court finds that in the context of the case, where C.R. was threatening to harm himself, had a history of violent outbursts, and might have become more agitated by being restrained in the control hold, no reasonable jury could find that Defendants acted with bad faith or gross misjudgment by using the transport hold to take him to the office even though he was resisting.

*Removal of Aide*

The Court also finds that no reasonable jury could find the failure to replace the classroom aide when she left toward the end of C.R.'s second-grade year constituted bad faith or gross misjudgment. First, no aide was required under C.R's IEP in effect at that time. *See Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1252 (10th Cir. 2008) ("If we do not allow teachers to rely on a plan specifically approved by the student's parents and which they are statutorily required to follow, we will put teachers in an impossible position—exposed to litigation no matter what they do.") Second, based on the undisputed testimony, the reason for placing the aide in C.R.'s classroom was to monitor C.R.'s relationship with Lily, but Lily had already transferred schools by the time the aide left the classroom. Third, there were only a few weeks left in the school year when the aide left, and there is no evidence that contradicts Sharrow's testimony that replacing the aide would have been virtually impossible before  the school year ended. Fourth, Zdrowski herself admitted that she does not disagree with the decision of C.R.'s current school not to provide a one-on-one aide. Finally, the IEP in effect during this time period provided for other means of support for C.R. in the classroom. Thus, summary judgment is warranted. *See also B.W. v. Durham Pub. Schs.*, 2012 U.S. Dist. LEXIS

85105, *22 (M.D.N.C. June 20, 2012) (granting judgment for defendants *sua sponte* based on the IDEA administrative record and holding that a school district's failure to provide for a one-on-one aide in a student's IEP did not violate the IDEA and noting that "While a school system 'must provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child, . . . the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.'").

*Bullying*

Finally, the Court turns to the allegations of bullying. In cases involving

> peer-on-peer harassment in the disability context, the Sixth Circuit has held that a plaintiff must show that (i) [he] was an individual with a disability, (ii) [he] was harassed based on his disability, (iii) the harassment was sufficiently severe or pervasive that it altered the condition of [his] education and created an abusive educational environment, (iv) the defendant knew about the harassment, and (v) the defendant was deliberately indifferent to the harassment.

*Griffin*, 2013 WL 3788826 at *8 (citing *S.S.*, 532 F.3d at 454). Plaintiff cannot meet this standard for several reasons.

First, Plaintiff has not proffered any evidence that C.R. was harassed based on his disability. Indeed, whether the other young students even knew that C.R. was disabled is unclear at best. C.R.'s BIP reflects that Defendants wanted to pursue some educational programs for C.R.'s classmates regarding his disabilities, but that Plaintiff vetoed the idea. And when Lily insulted C.R., she called him "mean"—not an adjective having to do with his disabilities. When asked at the hearing what evidence there was that Plaintiff was harassed based on his disability, Plaintiff's counsel merely stated, without citing to the record, that the other children had observed C.R. acting up in class and that they had witnessed him using the resource room. Even viewing the evidence in the light most favorable to the Plaintiff, the Court hesitates to assume that elementary school children would conclude that a misbehaving child must be misbehaving

34

due to a disability. And as defense counsel pointed out at oral argument, such an assumption would also run contrary to the statutory scheme governing this case, which seeks to maximize the potential of disabled children in the "least restrictive environment"—as Adamson testified, C.R. "needs to be with his classroom peers. He needs to be . . . given the same opportunities as any other student." (Adamson Dep. at 27.)

Second, Plaintiff has identified only a few incidents of objectionable conduct by C.R.'s peers. The first was Lily's allegation that C.R. touched her inappropriately. The second was the boy on the school bus making faces. The third was Lily calling C.R. "mean." These instances of bullying are not "severe and pervasive" so as to meet the standard for disability-related peer-on-peer harassment claims. *See Griffin*, 2013 WL 3788826 at *9 ("Plaintiff has alleged one instance of objectionable conduct, but 'harassment' must occur repeatedly, over an extended period." (citing cases)).

Third, Plaintiff has not proffered any evidence that Defendants were deliberately indifferent. The Defendants promptly investigated Lily's claims of sexual abuse, the investigation took one day, and C.R. returned to school thereafter. As to the autistic boy on the bus, Baldwin testified that she resolved the issue by speaking to the boy and explaining to him how he made C.R. feel. Finally, when Lily called C.R. "mean" in class, Rieck reprimanded her and wrote a note to her parents.

 Because no reasonable jury could find that the dragging incident, the removal of the aide, and the bullying constituted violations of the ADA and the Rehabilitation Act (whether considered alone or taken as a whole), summary judgment is granted to Defendants on Count I.

**2. Count II – Section 1983 Substantive Due Process**

Count II of the Amended Complaint alleges that Defendants' actions violated C.R.'s substantive due process rights. (*E.g.* Am. Compl. ¶ 60.) For the reasons set forth above, the claim partially fails based on procedural grounds. The alleged dragging incident remains. The Court finds that no reasonable jury could find that this incident rose to the level of a substantive due process violation.

> The Sixth Circuit has recognized two types of substantive due process rights:
>
> The first type includes claims asserting denial of a right, privilege, or immunity secured by the Constitution or by federal statute other than procedural claims under 'the Fourteenth Amendment *simpliciter* . . . .'
>
> The other type of claim is directed at official acts which may not occur regardless of the procedural safeguards accompanying them. The test for substantive due process claims of this type is whether the conduct complained of 'shocks the conscience' of the court.

*Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996) (quoting *Mertik v. Blalock*, 983 F.2d 1353, 1367–68 (6th Cir. 1993)).

Plaintiff's claim is of the latter type. Where students assert violations of their personal bodily integrity by educators—such as the dragging incident here—courts typically examine whether "the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Nolan v. Memphis City Sch.*, 589 F.3d 257, 269 (6th Cir. 2009). Further, for a substantive due process claim to proceed to trial, courts "customarily require the student to sustain dramatic physical injuries." *Ross v. Lamberson*, 873 F. Supp. 2d 817, 820 (W.D. Ky. 2012) (collecting cases).

36

The facts relating to the dragging incident do not come near to meeting these standards. The teachers were faced with an urgent situation—an upset pupil with a history of violent outbursts who was threatening self harm—that necessitated a swift physical response. *Cf. Webb v. McCullough*, 828 F.2d 1151, 1159 (6th Cir. 1987) ("[A] trier of fact could find that . . . [the principal's] need to strike Webb [for being caught with a boy and alcohol in her room] was so minimal or non-existent that the alleged blows were a brutal and inhumane abuse of [the principal's] official power, literally shocking to the conscience."). As to potential malice, the teachers both testified that they took action with the objective of preventing C.R. from harming himself or other pupils. There is simply no indication in the record that they were motivated by malice or a desire to hurt C.R. Given these circumstances, the Court does not find that the use of the transport position or even the alleged dragging are severe enough to raise a genuine issue of material fact regarding a substantive due process violation. *See Lillard*, 76 F.3d at 725–26 (holding on motion for summary judgment that even where the record "fail[ed] to reflect any legitimate disciplinary purpose occasioning" a teacher slapping the student-plaintiff, "it is simply inconceivable that a single slap could shock the conscience"). Finally, to the extent the photograph allegedly depicting C.R.'s arms would be admissible at trial, the single bruise on his forearm and red marks are not sufficient to defeat summary judgment. *See Saylor v. Bd. of Educ. of Harlan Cnty., Ky.*, 118 F.3d 507, 514–15 (6th Cir. 1997).

Summary judgment for Defendants is granted on Count II.

### 3. Count III – PWDCRA

Defendants argue that Plaintiff's claims under the PWDCRA are preempted by the Michigan Mandatory Special Education Act, Michigan Compiled Laws § 380.1701 ("MMSEA"). Michigan enacted the MMSEA to implement the IDEA's regulatory requirements.

*Miller ex rel. Miller v. Lord*, 686 N.W.2d 800, 802 (2004). Thus, the MMSEA and its related regulations govern the "preparation, content, and appeal of IEPs." *Id.* "Michigan courts have held that the comprehensive scheme of MMSEA preempts claims arising under the PWDCRA, if the claims relate to a student's education, because the latter statute addresses disabilities more generally than does the MMSEA, which targets specifically educational disabilities." *Griffin*, 2013 WL 3788826, at *10; *see also Woolcott v. State Bd. of Educ.*, 351 N.W.2d 601, 605 (Mich. Ct. App. 1984) (examining the MMSEA and the PWDCRA and commenting that "where there are two acts, one of which is special and particular and includes the matter in question, and the other of which is general, and which, if standing alone, would include the same matter and thus, conflict with the special act, the special act must be viewed as an exception to the general"); *Jenkins v. Carney-Nadeau Public School*, 505 N.W.2d 893 (Mich. Ct. App. 1993).

Thus, for example, in *Miller*, 686 N.W.2d at 801, a student's parents sued her teachers after she was sent out to the hallway for misbehaving in class and was subsequently sexually assaulted by another student. The Michigan Court of Appeals held that the parents' PWDCRA claims were preempted by the MMSEA. *Id.* at 804. The theory of the PWDCRA claim was that "the school failed to accommodate by ignoring Tierra's mother's request, as well as Tierra's need, that she not be placed alone in the hallway." *Id.* But pursuant to MMSEA regulations, "The issue of how to address Tierra's misbehavior was discussed in the IEP meeting between school officials and Sandra Miller. Specifically, 'time out of classroom' [was] listed as a consequence of inappropriate behavior in the 'behavioral intervention plan' section of the IEP." *Id.* at 803. Therefore, "the challenged actions (or inactions) by defendants revolved around an issue dealt with in the IEP" and the appropriate result was therefore to dismiss the PWDCRA claim as preempted by the MSEA. *Id.* at 804.

38

By contrast, in *Griffin*, a mentally and physically-disabled student's parents sued a school district based on several alleged acts and omissions; namely, that the teachers failed to follow precautions to keep the student from falling and incidents of abuse at the hands of another student and two of the named defendants. *Griffin*, 2013 WL 3788826, at *1. One of the student's IEPs "recognized her susceptibility to falling, but did not mandate any particular technique or practice to address that issue." *Id.* The court concluded that claims relating to the falling were preempted by the MMSEA, but that the alleged abuse claims were not:

> Plaintiff's PWDCRA claims against GISD and Heffner arise from the alleged failure of the school district and Heffner to implement properly Plaintiff's IEP to prevent her from falling down at school. . . . Therefore, Plaintiff's claims against GISD and Heffner are preempted by the MMSEA. However . . . Plaintiff's allegations that Sanders struck her and that Tereau sexually abused her have nothing to do with Plaintiff's IEP. Thus, the MMSEA does not bar the claims against Tereau and Sanders under the PWDCRA.

*Id.* at *10.

Here, "Plaintiff would concede that some of the issues were discussed at prior IEPS and are precluded under the MSEA," but argues that the transfer hold and alleged dragging were never discussed in a prior IEP and are therefore not preempted. (Pl.'s Resp. at 48.) In this case, C.R. had both an IEP and a "Behavior Intervention Plan" which resulted from a functional behavior assessment ("FBA").

Like the IEP, a BIP is a creation of the IDEA implementing regulations. "A child with a disability who is removed from the child's current placement . . . must . . . receive, as appropriate, a functional behavioral assessment, and behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur." 34 C.F.R. § 300.530(d). Similarly, if an IEP team finds that a child's "behavior impedes the child's learning or that of others," the team must consider behavior intervention strategies. 34 C.F.R. §

300.324. Finally, if the child's IEP team "make[s] the determination that [an act of misconduct] was a manifestation of the child's disability," they must conduct an FBA and create or modify a BIP for the child. 34 C.F.R. § 300.530. Michigan's regulations also provide for the creation of BIPs. Mich. Admin. Code R. 340.1011(f) (providing that the school social worker will "[d]evelop functional behavior assessments and behavior intervention plans to facilitate successful learning and socialization opportunities"). Indeed, a note at the end of C.R.'s BIP states that "[f]or any behavior(s), conduct or rules not mentioned above which are not a manifestation of the student's disability, the school code of conduct will be implemented," indicating that the BIP was developed in response to manifestations of C.R.'s disability in the classroom. (BIP at 2.)

Importantly, a BIP can be appealed through the IDEA administrative process. 34 C.F.R. § 300.532(a) (allowing appeal where a parent disagrees with "any decision regarding placement under §§ 300.530 and 300.531, or the manifestation determination under § 300.530(e), or [a Local Education Agency] that believes that maintaining the current placement of the child is substantially likely to result in injury to the child or others").

Given *Miller* and *Griffin*, the Court agrees that discussion of an issue in a prior IEP is indicative of preemption under the case law. The same logic applies to a BIP developed in response to manifestations of a student's disability. And here, the essence of Zdrowski's claim is that Defendants violated C.R.'s BIP in their response to his outburst in the classroom. (Pl.'s Resp. Br. at 37 ("If C.R. were not disabled, the Defendants would not have violated his BIP because there would not have been any BIP. In addition, C.R. would not have reacted by kicking, biting and screaming while being dragged to the office since these actions were manifestations of his disabilities."). In addition, C.R.'s 2012 IEP indicates that the IEP team "Consider[ed] . . .

40

Positive behavior interventions, supports, and strategies for students whose behavior impedes learning." (IEP No. 2 at 2.) And the 2013 IEP Amendments, while adopted after the dragging incident, also note that C.R. "struggles with aggressive behavior." (Dkt. 96, IEP Amendments at 2–3.)

Accordingly, the Court finds that Zdrowski's PWDCRA claims are preempted by the MMSEA. Therefore, they will be dismissed.

### C. Tort Claims (Counts IV, V, VI, and VII)

The Court finds that Defendants are entitled to governmental immunity on Plaintiff's claims of Assault and Battery (Count IV), False Imprisonment (Count VII), and Negligence (Counts V and VI) and they will therefore be dismissed. Accordingly, there is no need to address Defendants' alternate argument of Revised School Code Immunity.

### 1. Governmental Intentional Tort Immunity as to Counts IV and VII

In Michigan, governmental employees are entitled to intentional tort immunity if they can show

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority, (b) the acts were undertaken in good faith, or were not undertaken with malice, and (c) the acts were discretionary, as opposed to ministerial.

*Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008). "The applicability of governmental immunity is a question of law[.]" *Briggs v. Oakland Cnty.*, 742 N.W.2d 136, 137 (2007). And Michigan places the burden of persuasion on the defendant asserting governmental immunity. *Odom*, 760 N.W.2d at 228.

While it is undisputed that Adamson and Rieck took the challenged actions in the course of their employment as teachers with the School District, Plaintiff argues that they were not acting within the scope of their authority. Under the Behavior Intervention Plan, Plaintiff argues,

41

"[t]he Defendants were to contact C.R.'s mother or father immediately when he became violent." (Pl.'s Resp. at 46.) Therefore, Plaintiff says, the actions that Adamson and Rieck took after failing to call her or C.R.'s father are not entitled to governmental immunity under *Odom*. The Court disagrees.

To start, the Plan does not say what Plaintiff says it does: the entirety of the section at issue reads "if [C.R.] gets physical . . . contact parent [w]hen applicable". (Behavior Intervention Plan at 1 (ellipses in original).) It does not say "immediately." By contrast, the "Crisis Intervention" section of the Plan states that in a crisis situation, the "Principal/Office will be contacted immediately . . . ASAP." (*Id.* at 2.) There is no entry regarding C.R.'s parents in the "Crisis Intervention" section. And it is also unclear how an instruction to contact C.R.'s parents would limit his teachers' authority to take measures geared toward controlling his behavior in the classroom. Overall, there is nothing in the record to suggest that the instruction to call C.R.'s parents meant that no action could be taken until a call was made.

Taking actions to ensure the safety of a student and the stability of a classroom clearly falls within the scope of a teacher's authority. Rieck testified that while she knew about the Behavior Intervention Plan, she was facing a "crisis type situation" and because she was "dealing with the child and trying to focus [her] attention on him," she contacted the school secretary and assumed that "the chain would continue." (Rieck Dep. 26–28.) And Adamson stated that she understood the Plan to mean that C.R.'s parents would be contacted once a violent episode was over. (Adamson Dep. at 15.) And Baldwin, the school principal, testified that she would have used the transport method to bring a student to the main office if the student was agitated, showing that such an action would be in the scope of a teacher's authority. The only record item that suggests otherwise is the document describing the transport position that Rieck and

42

Adamson used to get C.R. to the office. Plaintiff emphasizes that the document states that the transport position is not to be used when the transportee is resisting. (Pl.'s Resp. Br. at 46.) In fact, the document states that "[i]t is not recommended to transport an individual who is struggling." (Dkt. 101-12, CPI Transport Position.) But this has no bearing on whether Rieck and Adamson could, within the scope of their authority as teachers, transport a student to the main office in a crisis situation.

As to the second element, "To determine the lack of good faith, courts should consider whether there is evidence of 'malicious intent, capricious action or corrupt conduct.' 'Willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference as to whether harm will result as to be the equivalent of a willingness that it does' and may be demonstrated by the conduct of or the failure to act by the defendant." *Wendrow v. Mich. Dep't of Human Servs.*, 534 F. App'x 516, 534 (6th Cir. 2013) (citing *Odom*, 760 N.W.2d at 225). The good faith standard is subjective. *Odom*, 760 N.W.2d at 225. Here, both Adamson and Rieck testified that they took the actions they did because they were concerned that C.R. was going to hurt himself or other students. And when asked if she would do the same thing if presented with the situation again, Rieck said she "would do it again because his safety was most important." (Rieck Dep. at 41.)

Finally, "[a]n act is ministerial in nature when it is done in obedience to orders or carried out by one who has little or no choice." *Broadnax v. Double*, No. 2:12-CV-12744, 2013 WL 5353243, at *10 (E.D. Mich. Sept. 24, 2013) (citing *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 668 (1984)). Adamson and Rieck were acting within their discretion to ensure the safety of their students when they took the actions at issue here. The last prong of the test is met.

As a matter of law, Adamson and Rieck are entitled to governmental immunity for Plaintiff's intentional tort claims. Counts IV and VII will be dismissed.

### 2. Governmental Negligent Tort Immunity as to Counts V and VI

Plaintiff asserted two negligent tort claims. But in her response, Plaintiff "concedes that the School District is immune from the negligence claim contained in Count VI of the First Amended Complaint." (Pl.'s Resp. at 46.) Therefore, Count VI will be dismissed. This leaves Count V, the negligence claim against Rieck, Adamson, and Sharrow.

Again, Defendants argue they are immune from liability pursuant to Michigan Compiled Laws § 691.1407(2). With respect to negligent torts,

> Michigan law provides governmental employees acting on behalf of a governmental agency with immunity from tort liability for injuries they cause during the course of their employment if all of the following are met: (1) the employee is acting or reasonably believes he or she is acting within the scope of his or her authority; (2) the governmental agency is engaged in the exercise or discharge of a governmental function; and (3) the employee's conduct 'does not amount to gross negligence that is the proximate cause of the injury or damage.'

*Bennett v. Krakowski*, 671 F.3d 553, 560 (6th Cir. 2011) (citing Mich. Comp. Laws § 691.1407; *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (Mich. 2000)). The Court finds that Defendants are entitled to immunity on the negligence claim.

As discussed above, Rieck and Adamson were acting within the scope of their authority when they subdued C.R., who was threatening to harm himself. And supervising Rieck and Adamson is a function within the scope of Sharrow's authority as the school superintendent. Second, in educating C.R. and providing for his supervision while at school, the School District was discharging a governmental function – public education. As to the third element, Plaintiff argues that there are fact issues as to whether Defendants' conduct in failing to immediately

contact C.R.'s parents and putting C.R. in a transfer hold constitutes gross negligence. The Court disagrees.

"'Gross negligence' is 'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.'" *Bennett*, 671 F.3d at 560. "It has been characterized as a willful disregard of safety measures and a singular disregard for substantial risks." *Oliver v. Smith*, 810 N.W.2d 57, 62 (Mich. Ct. App. 2010). "It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea v. Crabtree*, 687 N.W.2d 333, 339–40 (2004). When a Defendant asserts the defense of immunity, "where, on the basis of the evidence presented, reasonable jurors could not differ with respect to whether a defendant was grossly negligent, summary disposition should be granted." *Id.*

Plaintiff cites *Kendricks v. Rehfield*, 716 N.W.2d 623, 682 (Mich. Ct. App. 2006). Kendricks was arrested for a felony offense that was in fact committed by his twin brother. Despite his protests, the Detroit police department held him in jail for seven months until they investigated and confirmed his identity. In affirming the circuit court's denial of government immunity on a motion for summary judgment, the Michigan Court of Appeals commented that there was at least a fact issue as to gross negligence because "Defendants had access to fingerprints and photographs of both plaintiff and his brother throughout the seven months, and could have easily confirmed plaintiff's identity with this readily accessible information," yet failed to do so for over half a year. *Id.*

This is a different case. There is extensive testimony that, far from disregarding C.R.'s safety, Rieck and Adamson took action to protect C.R. from harming himself. They removed the pencil he was threatening to harm himself with, removed him from the classroom to get him

45

away from other potentially harmful instruments, and took him to the office to allow him to cool down in a quiet area. And Rieck testified that she delayed calling C.R.'s parents because she was focused on his safety above all else, and because she assumed that her call to the school secretary would set off a chain of communication that would reach C.R's parents. She also stated that she would conduct herself in the same manner if faced with the situation again because C.R.'s safety was her first priority.

This case is closer to *Tarlea*. There, the Michigan Court of Appeals reversed a denial of governmental immunity to football coaches who ran a football training camp where a player collapsed of heat stroke and died. *Tarlea*, 687 N.W.2d at 338. The evidence showed that the coaches provided water to the athletes, allowed them to take breaks, and that the one-and-a-half mile run that precipitated the player's collapse was not mandatory. *Id.* Further, on the day of the collapse, the temperature was just above seventy degrees. The court found that "No reasonable person could conclude that these coaches exhibited a substantial disregard for the safety of the student athletes. Indeed, the facts of this case show just the opposite: that defendants exhibited a high degree of care and professionalism in discharging their roles as coaches." *Id.* at 340.

Similarly here, there is no evidence that Rieck, Adamson, or Sharrow willfully disregarded safety measures or did not care about C.R.'s safety. To the contrary, the uncontradicted evidence shows that their actions were motivated by a desire to keep C.R. from harming himself. Defendants have demonstrated that they are entitled to governmental immunity as to the negligence claim. Count V will be dismissed.

### 3.  Educational Malpractice Limitation as to Counts V and VI

Defendants also argued that Michigan courts do not recognize claims of "educational malpractice" in the tort setting and that therefore the negligence claims should be dismissed.

46

Having found that the individual Defendants are entitled to governmental immunity on the negligence claims and Plaintiff having agreed to dismiss the negligence claim against the School District, there is no need to reach this issue.

## IV. CONCLUSION

For the reasons set forth at length above, the Court GRANTS Defendants' Motion for Summary Judgment (Dkt. 69) on all claims. It follows that this case is DISMISSED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: August 11, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 11, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson